**Mattiebelle HARRIS, et al., Plaintiffs,**

v.

**John O. MARSH, Jr., et al., Defendants,**

**and**

**Leonza LOFTIN, Plaintiff,**

v.

**John O. MARSH, Jr., et al., Defendants.**

**Civ. A. Nos. 81–60–CIV–3, 80–168–CIV–3.**

United States District Court,
E.D. North Carolina,
Fayetteville Division.

Aug. 30, 1983.

J. LeVonne Chambers, Ronald L. Gibson, Gilda F. Glazer, Chambers, Ferguson, Watt, Wallas, Adkins & Fuller, P.A., Charlotte, N.C., Jack Greenberg, Charles Steven Ralston, New York City, for plaintiffs.

Dennis Moore, Asst. U.S. Atty., Raleigh, N.C., Peter B. Loewenberg, Cpt. Thomas J. Feeney, Robert B. Williams, MAJ, JAGC, Civilian Personnel Litigation, Office of Judge Advocate Gen., Dept. of Army, Washington, D.C., Stephen L. Berry, CPT, JAGC, Fort Bragg, N.C., for defendants.

## MEMORANDUM OF DECISION

JAMES C. FOX, District Judge.

Plaintiffs, four black civilian employees and one black former employee of the Unit-

ed States Army at Fort Bragg, North Carolina, initiated this action pursuant to the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16 *et seq.* The case is before the court on plaintiffs' motion for class certification pursuant to Fed.R.Civ.P. 23.

## I. PROCEDURAL BACKGROUND

The complaint alleges that defendants engage in racially discriminatory employment practices in the following areas: (1) promotions; (2) pay for similar or the same work by comparably qualified black and white employees; (3) merit pay increases; (4) assignment of black employees to lower level positions and underrepresentation of black employees at higher general schedule or "white collar" and supervisory positions; (5) job performance evaluations; (6) rate of conversion of black employees from temporary to permanent positions; (7) discipline; (8) use of subjective employee selection criteria which adversely affects black employees' efforts at promotion or transfer; (9) reductions-in-force (RIF); and (10) retaliation for exercising rights under Title VII. The complaint seeks, *inter alia,* back pay, injunctive and declaratory relief, and a determination that the case proceed as a class action. Plaintiffs have requested a class defined as:

> All present and former black civilian employees of the United States Army at Fort Bragg, North Carolina, who, at any time since April 14, 1976 (1) have been denied promotions, details, awards, or training; (2) have been discriminated against by defendant's reduction-in-force practices; and (3) have been subjected to discriminatory disciplinary, appraisal, or evaluation practices by defendant because of their race or color; or (4) have suffered reprisals because of their efforts to exercise their rights under Title VII of the Civil Rights Act of 1964.

By order filed March 31, 1982, the court consolidated this action and *Loftin v. Marsh,* No. 80–168–CIV–3, for discovery and trial. Plaintiff Loftin filed an individual claim; his motion for intervention in the *Harris* case has been denied. Extensive discovery has been conducted on both the individual and class claims. Trial was originally scheduled for May 9, 1983. On February 22, 1983, defendant requested a determination that the case not proceed as a class action. The court denied the motion, but directed plaintiffs to move for class certification by April 18, 1983, and continued the trial date to August 1, 1983. Plaintiffs properly filed their motion, supported by a memorandum of law and exhibits, and defendant responded. A hearing was conducted on May 17, 1983, at which plaintiff presented further evidence. Each party has submitted at least one supplemental pleading. By order dated June 30, 1983, the court denied plaintiffs' motion. This memorandum of decision is intended to set out the court's fact findings and conclusions of law on this decision.

Several items must be discussed before the court can reach the merits of the motion. First, there is the question of which of the ten areas set out in the complaint are actually in issue. The court views the action primarily as a promotion case, and as an attack upon defendants' Merit Promotion Plan. To the extent that plan includes consideration of performance appraisals, awards, details, and the excessive use of subjective discretion, those issues may also be present in the case. As separate, but related issues, there are allegations concerning discipline, retaliation, and RIF's. Finally, there is the broad issue of "underrepresentation" which is, in fact, not really a separate issue but is rather alleged to be the result of the unfair practices challenged. These are, in the court's view, the bare *issues* presented.

Engrafted upon this statement of issues, however, are the claims of the individual plaintiffs. Whether each, or any, of the issues identified is reflected in the claim of a plaintiff is a matter of substantial importance for, to the extent that an issue is not so reflected, the plaintiff is not an appropriate class representative. Additionally, while the issue may be reflected in a statement of claim, the presentation of the claim by that plaintiff may be untimely.

Therefore, the court must consider two areas: First, with regard to the issues presented, the court must briefly discuss the procedures at Fort Bragg which give rise to these issues. While recognizing that the litigants differ over how these procedures are applied, the court has attempted simply to state how the procedures work, or are supposed to work. Second, the court must examine the claims of the named plaintiffs, not only to identify the claims raised but also to determine which, if any, of those claims were timely filed.

## II. FORT BRAGG PERSONNEL POLICIES

Fort Bragg and neighboring Pope Air Force Base comprise one of the world's largest military installations. Indeed, Fort Bragg's population of 157,000 ranks it as the fifth largest "city" in North Carolina. As might be expected, an installation of this size requires significant "support" services, many of which are provided by the resident civilians in the area. Civilian positions are divided into two categories with differing pay scales: WG, generally lower paying "blue collar" jobs, and GS, higher paying "white collar" jobs. The number of civilian employees is established by the Department of Defense and has fluctuated considerably since the Vietnam War. The civilian work force has been most significantly affected by reductions-in-force (RIF's) and hiring freezes, several of which have occurred since 1976.

The plaintiffs challenge primarily five aspects of the Fort Bragg personnel process: promotions, training, discipline, awards and RIF.

### A. Promotions

Promotions at Bragg are generally awarded in accordance with the base Merit Promotion plan, although there are instances in which promotions are awarded by other methods, such as priority consideration. The job which is to be filled must first be adequately described. A "position classifier" consults with management and compiles a description of the position and assigns it an "occupational title" and series, as well as a pay grade. The opening is posted by a "Merit Promotion Vacancy Announcement," which designates the sources of candidates (e.g., post-wide, DOD-wide, etc.) and contains a description of "highly qualifying criteria" for the position, which qualifying criteria are compiled by the position supervisor in consultation with the Civilian Personnel Office (CPO). The vacancy announcement also contains "minimum qualification requirements," which are compiled with reference to Office of Personnel Management handbooks X–118 and X–118–C, and which are used by CPO to determine basic eligibility for the position.

After an application is received by CPO and screened for "minimum qualifications," CPO was, under procedures applied prior to June, 1982, required to identify "highly qualified" candidates for the position. This process required CPO to compare eligible candidates with the "highly qualifying criteria" contained in the vacancy announcement. CPO then, through use of a numerical "rating guide," compares the highly qualified candidates and ranks them. The top candidates (usually between three and five, but occasionally as many as ten) are denominated the "best qualified" candidates and are placed on a "Referral and Selection Register," which is forwarded to the official who will be filling the position. The respective ranks of the candidates is not revealed on the register. The selecting official, either alone or by panel, interviews the "best qualified" candidates and makes his or her selection. See affidavit of Jerry Horne, at 13–25.

Originally, CPO only referred the top five candidates; subsequently, pursuant to an agreement with the employee collective bargaining unit, those applicants whose score on the "rating guide" was at least 85% of the score of the highest ranking applicant were referred.

In determining eligibility, CPO reviews the personnel files of the applicants (the "201" file) and considers education, awards, and performance appraisals in reaching its determination.

### B. *Discipline*

Disciplinary action is divided into two categories: formal and informal. Informal discipline includes oral reprimands, which may be undocumented or documented by a "Memorandum of Record" or by an entry on the employee's "Employee Records Card" (the "Seven Card"). Formal disciplinary action consists of written reprimands, suspensions, and removals; a schedule of punishments for certain offenses is outlined in the federal personnel manual. Horne affidavit, at 30–31.

### C. *Training*

Training requests are initiated by supervisors and forwarded to CPO, which conducts a review of the employee's eligibility for training.

### D. *Awards*

There are two types of incentive awards—honorary and cash awards. Cash awards include Sustained Superior Performance Awards (SSPA's) and Quality Step Increases (QSI). Only General Schedule (GS) employees are eligible for QSI's. The award process is initiated by the employee's supervisor.

### E. *RIF*

Once a decision that a reduction-in-force is necessary is rendered, CPO conducts a review to determine which positions will be abolished and the placement rights of the position's incumbent. The employee is first considered for reassignment into an existing vacancy. If this is not possible, the affected employee may have the right to "bump" any employee at a lower level and occupy that position. Should this not be possible, the employee may be allowed to "retreat" to a position from which he was previously promoted and displace the occupant of that position. All displacement actions are recorded, and displaced employees are listed in order of "retention standing." The listing continues in effect until an affected employee receives a job offer. Should no offer be received, the employee is scheduled for separation and registered in an outplacement program. The system makes no allowances for affirmative action and is largely tenure based. Horne affidavit, at 27–30.

### III. CLAIMS OF THE NAMED PLAINTIFFS

Any inquiry into the propriety of class certification must begin with an analysis of the claims presented by the named plaintiffs. The class claims are limited by the individual claims, *Rodriguez,* 431 U.S., at 403, 97 S.Ct. at 1896, which in turn are limited by the administrative procedures outlined in Title VII. *Chisholm v. United States Postal Service,* 665 F.2d 482, 490 (4th Cir.1981).

### A. SANDRA BLUE

Plaintiff Blue commenced her employment at Fort Bragg in 1973, as a temporary (later permanent) Nursing Assistant, GS–4. In July, 1975, she applied for, and received, the position of Dental Assistant, GS–3. This was an entry level position designed for people who, like Blue, had no prior experience in the dental field. Blue was promoted to Dental Assistant, GS–4, in 1976 and occupied that position until her resignation effective July, 1983. In October, 1978, Fort Bragg's dental unit created GS–5 positions. Blue applied for two of these positions but was not selected; a black was selected for one of the positions for which Blue applied.

Blue contends that she received unfairly low supervisory evaluations which hindered her attempts at promotion. She further complains of two reprimands she received from her supervisor, one of which concerned her alleged refusal to remove her car from a fire lane and the other which concerned her alleged absence from her duty station. On April 24, 1980, Blue filed an EEO complaint concerning the reprimands and the appraisals. She resigned from employment at Fort Bragg effective July, 1983.

### B. ROBERT EVANS

Evans was appointed Firefighter Trainee GS–3, in October, 1972. In 1978, Evans

applied for the position of Firefighter, GS–5. He was not selected, but alleged that his personnel files were not correct and complained to the EEOC office. CPO offered him priority consideration for the next available vacancy. Two vacancies arose in November, 1979, but were offered to firefighters from Pope AFB who had, allegedly, previously been displaced in a RIF, and therefore allegedly had priority over Evans. Evans later received a promotion, but filed an EEO complaint on February 29, 1980, which concerned both his failure to receive the first position and a request for back pay.

### C. MATTIEBELLE HARRIS

Harris was first employed as a Clerk Typist, GS–2, in 1965. She eventually occupied the position of Editorial Assistant, GS–6, until May, 1979, when her position was abolished in a RIF. Harris exercised her RIF rights and moved to the position of Editorial Assistant GS–5. Her pay continued at the GS–6 level until January, 1982, when she refused a repromotion offer. The GS–5 position was later upgraded to GS–6 and Harris occupied that position. Harris was then "detailed" to the position of Writer-Editor GS–9. After the end of the detail, her supervisor restructured the position as a trainee position (GS–7 to GS–9), and Harris was selected for the position.

Harris has brought forward a number of claims, but, as noted by the EEOC complaints examiner, only two of her allegations are properly within the limitations period. 29 CFR § 1613.602(a). These complaints are that she was not selected for a position for which she applied in February, 1980 and that the denial of the promotion was an act of reprisal. Her allegations of discrimination in training, selection for "upward mobility" programs, discipline, and RIF are time-barred.

### D. EDWARD HUMPHREY

Humphrey is employed as a Pest Controller, WG–8, and has been so employed since 1970. He complains of his failure to be selected for a foreman position for which he applied, and also asserts that he has not received awards or letters of appreciation.

### E. SAMUEL SHEPPARD

Sheppard was first employed as an Aircraft Mechanic WG–10. In November, 1980, he obtained a position of Photographer, GS–5, and currently occupies that position. He also complains that he has not been selected for various promotions.

The only class claims which may be advanced by the named plaintiffs are those concerned with the discrete positions of the personnel process in which these plaintiffs claim to have suffered discrimination. A review of the exhibits, the memoranda, and, particularly, the deposition testimony of these plaintiffs reveals that this case is primarily concerned with discrimination in the promotion process at Fort Bragg, and indeed, plaintiffs' counsel so admitted at the certification hearing. While there are issues concerning awards, training, discipline, and retaliation which must be considered, the court views the primary thrust of this action as a challenge to the Fort Bragg promotion process.

### IV. SCOPE OF THE INSTANT INQUIRY

An initial question posed is the depth of the inquiry to be conducted on the motion for class certification. The Supreme Court has cautioned against advancing a decision on the merits to the class certification stage see *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974), and indeed there are many cases which provide that where the complaint facially complies with the requirements of Rule 23, a class should be conditionally certified at an early stage in the proceedings. See C. Wright and A. Miller, *Federal Practice and Procedure,* § 1785 (1972). This notion of the scope of the certification hearing squares nicely with the "across-the-board" approach in Title VII cases, which holds, essentially, that *any* victim of racial discrimination in employment may maintain a broad attack on all unequal employment practices alleged to

have been committed by the employer pursuant to a policy of racial discrimination. See *Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122 (5th Cir.1969); *Payne v. Travenol Laboratories, Inc.,* 565 F.2d 895 (5th Cir.) *cert. denied* 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978). The theory that any claim of racial discrimination in employment is *per se* a class claim eliminated the need for a searching inquiry into the merits of the claims or the compliance with the requisites of Rule 23. See, e.g., *Abron v. Black & Decker (U.S.) Inc.,* 654 F.2d 951, 964 (4th Cir.1981) (Murnaghan, J., dissenting).

Recent cases, culminating in *General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), have substantially limited the "across-the-board" approach and have, concurrently, intensified the burden upon the movant for class certification. A "... Title VII class action, like any other class action, may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Falcon,* 102 S.Ct. at 2373. Moreover, the class representative must demonstrate that he is part of the class and possesses the same interests and suffers the same injury as the putative class members. *East Texas Motor Freight System v. Rodriquez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977). Clearly *Falcon* requires the trial court to engage in an extensive factual analysis at the certification stage in order to satisfy itself that the requirements of Rule 23 have been met, *see Fleming v. Travenol Laboratories, Inc.,* 707 F.2d 829, 833 (5th Cir.1983), and thereby increases the burden upon the movant to *specifically* demonstrate compliance with each requirement of the rule. See *Note,* Title VII Class Actions After *Falcon,* 8 Empl.Rel.L.J. 526 (1983).

■ When contemplating its decision on certification, the court must remember two fundamental criteria: First, that the class action device is, and should be, the exception rather than the rule; and second, that the burden remains upon the plaintiffs to demonstrate that class treatment is appropriate.

This action presents an appropriate opportunity to conduct the "rigorous analysis" required by *Falcon.* The parties have engaged in extensive, class-wide discovery. Depositions of putative class members have been presented for the court's review. Counsel have submitted lengthy briefs, accompanied by numerous exhibits. A hearing was conducted at which evidence was admitted and the arguments of counsel were considered. The court has before it a fully adequate record upon which to conduct its analysis of the compliance with the requirements of Rule 23.

## V. ADVERSE IMPACT OR DISPARATE TREATMENT?

■ An issue important to plaintiffs' burden is whether this action should be analyzed under the adverse impact or disparate treatment theory. The adverse impact theory applies where "... practices, procedures or tests neutral on their faces ..." have the effect of discriminating against a protected group. *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). No intent to discriminate need be shown. *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). The disparate treatment theory requires plaintiff to prove discriminatory motive. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 349, 97 S.Ct. 1843, 1861, 52 L.Ed.2d 396 (1977).

■ Here the primary challenge is to defendants' promotional process. Plaintiffs have not isolated any particular portion of that process, such as an aptitude test or educational requirement, which is clearly amenable to analysis under the adverse impact theory. *See, e.g., Carpenter v. Stephen F. Austin State University,* 706 F.2d 608, 620 (5th Cir.1983). Rather, plaintiffs attack a classification and selection system which is based upon subjective and discretionary decisions by managers. See *Everitt v. City of Marshall,* 703 F.2d 207, 209 (5th Cir.1983). "Selection processes which rely on subjective judgments, despite the corral-

ing by objective standards, provide the opportunity for intentional discrimination cognizable in a disparate treatment action." *Pegues v. Mississippi State Employment Service,* 699 F.2d 760, 765 (5th Cir.1983). See generally C. Sullivan, M. Zimmer, and R. Richards, Federal Statutory Law of Employment Discrimination, § 1.5(c) (1980). *But see Rowe v. Cleveland Pneumatic Co.,* 690 F.2d 88, 95 (6th Cir.1982); *Moore v. Hughes Helicopters Co.,* 708 F.2d 475, 481 (9th Cir.1983). This court believes that the Fifth Circuit's analysis of this issue is more persuasive, and accordingly will analyze this action under the disparate treatment theory.

## VI. COMPLIANCE WITH RULE 23 REQUIREMENTS

### A. THE ROLE OF STATISTICS

■ *Falcon* clearly establishes that in Title VII class actions, as in all others, there must be rigorous compliance with the requirements of Rule 23. See *Eastland v. Tennessee Valley Authority,* 704 F.2d 613, 618 (11th Cir.1983). Title VII cases are somewhat unique, however, because of the reliance upon statistics, especially in disparate treatment cases, to provide a strong inference of discriminatory intent, upon which direct evidence is often lacking. An adverse impact case is unlikely to succeed without some statistical showing sufficient to demonstrate a discriminatory result arising from a racially neutral practice. However, statistics occupy a different role in a disparate treatment case, in which a number of people may be expected to offer testimony relating to the manner in which they have suffered discrimination. Combined with compelling anecdotal testimony, or with evidence of a significant history of discrimination at the facility in question, see *Rivera v. City of Wichita Falls,* 665 F.2d 531 (5th Cir.1982), a showing of a significant statistical disparity between, for example, the number of qualified blacks applying for a certain position or group of positions and those actually receiving the position, may support an inference of discriminatory intent. Conversely, should plaintiff's statistical showing be either deficient or less than persuasive, the importance of anecdotal and "historical" evidence is greatly increased. *Carpenter,* 706 F.2d, at 623.

■ Plaintiff's presentation is two-fold, statistical and anecdotal. The anecdotal evidence consists of the deposition testimony, along with certain other evidentiary material, of approximately 50 black Fort Bragg employees, culled from the 1,000 alleged class members. As might be expected, this testimony tends to focus upon discrete portions of the promotion process, primarily subjective decisions. This court's review of the anecdotal evidence, including the deposition testimony and the evidence presented at the certification hearing, along with careful review of the claims of the selected putative class members outlined in the briefs, convinces it that plaintiffs have failed to show, by anecdotal evidence alone, that a significant number of the alleged class members have been discriminated against in the same way as have the named plaintiffs. *Metrocare v. WMATA,* 679 F.2d 922, 929 (D.C.Cir.1982). The anecdotal evidence presented could, certainly, serve to "buttress" significant statistical evidence, *Eastland,* 704 F.2d, at 618, but does not, standing alone, suffice to demonstrate that the numerosity and typicality factors have been met.

The court must, therefore, attempt to analyze the statistical evidence presented in order to determine whether the requirements of Rule 23 have been met. Plaintiffs direct the court to four sets of statistics:

1. Distribution of civilian employees within 38 organizational units on Fort Bragg, by race and sex.

2. Quality step increases received by blacks and whites by year.

3. Training courses received by blacks and whites by year.

4. Incidents of discipline by blacks and whites by year.

In a supplemental pleading, plaintiffs attached a set of statistics entitled "Assessment of Underrepresentation Using Differentiated Workforce Availabilities."

Defendants have clearly and convincingly demonstrated the inadequacy of this statistical presentation, and have offered sets of statistics which argue compellingly that no class exists.

### 1. Promotion and "Underrepresentation."

Plaintiffs contend that the charts showing the percentages and numbers of blacks in selected grade levels and positions at Bragg tend to demonstrate that blacks are "underrepresented" in the more desirable, higher paying jobs. This contention is buttressed, plaintiffs contend, by the Fort Bragg Affirmative Action Plan (AAP), which "admits" such underrepresentation. This simply is unpersuasive. Charts which purport to demonstrate a predominance of blacks in less desirable positions may reflect imbalances but do not show that race, rather than work preference, education, experience, and the state of the job market cause the imbalances, and are thus of little probative value. *Pegues,* 699 F.2d at 766. See also D. Baldus and J. Cole, Statistical Proof of Discrimination, § 1.22[23] (1980). These charts also fail to answer the primary question: how many blacks *should* there be in a particular occupation? To assert that blacks should be represented in positions such as engineers or physicians in proportion to their representation in the community at large is absurd. For the charts and AAP plan to assume any relevance, it must be demonstrated that blacks do not occupy specific positions in proportion to the availability of qualified blacks for those positions. *Woodard v. Lehman,* 530 F.Supp. 139, 145 (D.S.C.1982); *Jones v. First Federal Savings and Loan Assoc.,* 546 F.Supp. 762, 774 (M.D.N.C.1982). The Army's AAP for Fort Bragg is formulated on the basis of general population, regardless of skills, and is neither an "admission" of discrimination nor proof that such discrimination exists. *Valentino v. USPS,* 674 F.2d 56, 68 (D.D.C. 1982). *Frink v. U.S. Navy,* 16 FEP 67, 71 (E.D.Pa.1977).

Nor do the statistics presented in plaintiff's supplemental pleading serve to raise any compelling inference of discrimination. As defendant states, this is a promotion case, *not* a hiring case; plaintiff's claims are that they were not *promoted* in the same manner as similarly situated white employees. The comparison with Fayetteville SMSA "availables" of certain rather vague occupational categories is unconvincing.

Defendants' statistical presentation, which stands in large measure unrefuted, demonstrates that blacks have been *favored* in promotions:

PROMOTION OF BLACKS AT FORT BRAGG

| | BLACKS IN BRAGG WORK FORCE | ACTUAL PROMOTIONS |
|---|---|---|
| 1979 | 22.9% | 21.6% |
| 1980 | 22.8% | 24.2% |
| 1981 | 23.5% | 23.9% |

Defendants' essentially unrefuted statistical presentation leads to the inescapable conclusion that blacks have not been disfavored, to a statistically relevant degree, in promotions. Plaintiffs' statistical showing on this point is essentially meaningless, and it must be remembered that on this issue, plaintiffs bear the burden of proof.

### 2. Awards.

Similarly, plaintiffs' statistics on the awards issue are flawed. Plaintiffs' statistician simply failed to account for the fact that Wage Grade (WG) employees are *not eligible* for quality step increases. When this error is corrected, it is clear that black employees are not disfavored in the receipt of QSI's. *See* Appendix 3.

### 3. Training.

With regard to training, plaintiffs' statistics are based upon the assumption that all employees require the same amount of training. Common sense dictates that employees whose jobs entail greater levels of responsibility will require more training. As defendants' chart indicates, blacks and whites who occupy positions requiring more training generally receive similar amounts of training. See Appendix 4.

#### 4. *Discipline.*

Finally, plaintiffs' statistics relating to disciplinary actions address only those actions resulting in suspension or removal, and none of the named plaintiffs were so disciplined in the relevant time period.

## B. ANALYSIS

### 1. *Numerosity*

██ Numerosity is determined not by reference to the number of people potentially protected by Title VII but only those affected by the challenged personnel processes. *Doctor v. Seaboard Coast Line,* 540 F.2d 699 (4th Cir.1976). Plaintiffs, adhering to the "across-the-board" approach, seek to represent all black employees at Bragg. Plaintiffs have offered scant evidence as to the alleged claims of fifty-five employees in their motion. Contrary to plaintiffs' assertions, most of these individuals do not present a *prima facie* case of discrimination. The material presented at the certification hearing, along with the several depositions, fails to significantly improve upon the bare statements contained in the motions. Plaintiffs have failed to convince the court that the numerosity element has been met.

### 2. *Commonality*

This is the weak link in defendants' argument because, in the court's view, "commonality" is the element of Rule 23 which is easiest to demonstrate. For example, in *Chisholm* the Fourth Circuit concluded that the commonality requirement was " . . . met by the existence of the issue whether [defendant] has discriminated against black employees in the denial of promotion and promotion opportunities by means of detailing, written tests, discriminatorily applied selection procedures, and illegal and discriminatory discipline, among other things." 665 F.2d, at 492. These plaintiffs have initiated a similar challenge, and the challenge to the promotion process *itself,* as opposed to discrete, individual challenges by particular people to their failure to obtain a particular position, *does* present common

issues of law and fact, at least to the extent that the "pre-referral" processes are challenged. While the court concludes that plaintiffs fail the remaining tests of Rule 23, the court is not convinced that common issues of law and fact do not exist with regard to the claims of the named plaintiffs and some of the putative class members.

### 3. *Typicality*

██ Typicality requires that "the claims or defenses of the class 'resemble' or 'exhibit the essential characteristics of' those of the representatives." *Pendleton v. Schlesinger,* 73 F.R.D. 506, 509 (D.D.C.1977) (footnote omitted). While an allegation of a broad discriminatory policy may satisfy the requirements of Rule 23(a)(2), a plaintiff must also show that the impact of those policies on him is not wholly aberrant or dissimilar from the impact on other class members. *See* Class Actions After *Falcon,* 8 Empl.Rel.L.J., at 532.

██ The role of statistical evidence at the certification stage is not, as at trial, to support an inference of racial discrimination; at this point, the court must accept plaintiffs' allegations of discrimination as true. Statistical evidence likewise has little bearing on the "commonality" or "adequacy of representation" factors of Rule 23(a). A convincing statistical showing *can,* however, when combined with significant anecdotal evidence, demonstrate that the claims of the named plaintiffs are "typical" of those of the putative class members, and that, therefore, the class is so numerous that joinder of all members would be impractical.

Defendants' statistical presentation rather convincingly demonstrates the absence of this element. The statistics tend to reveal that black employees at Fort Bragg are, in general, promoted in proportion to their numbers in the work force, receive awards in that proportion, and are trained in the same manner as their white counterparts. While plaintiffs, and perhaps others, have suffered discrimination in certain aspects of defendants' personnel processes, the statistics, as presently constituted, suggest that

this discrimination is the exception rather than the rule. Plaintiffs have failed to persuade the court that their claims are typical of those of the class.

### 4. *Adequacy of Representation*

 · Neither the court nor the defense challenge the adequacy of plaintiffs' counsel as representatives. This element concerns more the identity, or lack thereof, of the claims of the named plaintiffs with those of the alleged class. *Rivera,* 665 F.2d at 531. The court has concluded that plaintiffs' claims are atypical; it therefore follows that plaintiffs are not adequate representatives for people who possess different claims.

### C. CONCLUSION

Based upon the voluminous material which has been presented for the court's consideration, the court concludes that plaintiffs have failed to meet their burden of demonstrating compliance with the requirements of Rule 23. Of course, plaintiffs are not precluded from once again seeking certification should the evidence presented at trial demonstrate that certification is proper. At this point, however, the motion must be, and hereby is, DENIED.

### APPENDIX 1

#### CIVILIAN WORK FORCE REPRESENTATION
#### FORT BRAGG

| YEAR | TOTAL | BLACKS | PERCENT |
|------|-------|--------|---------|
| 75 | 4488 | 943 | 21.01 |
| 76 | 4418 | 932 | 21.10 |
| 77 | 4239 | 896 | 21.14 |
| 78 | 4007 | 892 | 22.26 |
| 79 | 3799 | 836 | 22.01 |
| 80 | 4257 | 965 | 22.67 |
| 81 | 4339 | 989 | 22.79 |
| 82 | 4424 | 1022 | 23.10 |

### APPENDIX 2

#### ANALYSIS OF APPLICANT CHARACTERISTICS
#### MERIT PROMOTIONS

| | BLACK | WHITE |
|---|---|---|
| **AVERAGE TENURE IN YEARS PER APPLICANT** | | |
| 1979 | 9.7 | 11.0 |
| 1980 | 10.1 | 11.7 |
| 1981 | 10.5 | 11.6 |
| **APPLICATIONS PER PERSON PER YEAR** | | |
| 1979 | 3.6 | 3.1 |
| 1980 | 5.0 | 4.5 |
| 1981 | 3.8 | 3.3 |

**AVERAGE GRADE LEVEL OF APPLICANTS WITHIN PAY PLAN**

| PAY PLAN AND YEAR | BLACK | WHITE |
|---|---|---|
| GS – 1979 | 3.7 | 4.5 |
| GS – 1980 | 3.9 | 4.6 |
| GS – 1981 | 4.0 | 4.6 |
| WG – 1979 | 5.3 | 7.6 |
| WG – 1980 | 5.0 | 7.9 |
| WG – 1981 | 4.3 | 7.6 |
| WL – 1979 | NA | 12.0 |
| WL – 1980 | 6.0 | 10.0 |
| WL – 1981 | 9.0 | 10.3 |
| WS – 1979 | 2.0 | 6.0 |
| WS – 1980 | 5.3 | 7.8 |
| WS – 1981 | 5.7 | 6.3 |

## APPENDIX 3

Quality Step Increases by Race:

(1) Plaintiff's Chart (not adjusted for factor that WG employees not eligible for QSI):

| YEAR | BLACK | | WHITE | | Standard Deviation [22] |
|------|-------|-----|-------|-----|------------|
| | No. | % | No. | % | |
| 1975 | 18 | 13.8 | 112 | 86.2 | 2–3 |
| 1976 | 9 | 7.9 | 105 | 92.1 | More than 3 |
| 1977 | 6 | 6.7 | 84 | 93.3 | More than 3 |
| 1978 | 18 | 12.3 | 130 | 87.7 | 2–3 |
| 1979 | 31 | 13.2 | 203 | 86.8 | More than 3 |
| 1980 | 19 | 14.6 | 111 | 85.4 | 2–3 |
| 1981 | 20 | 16.3 | 103 | 83.7 | 2–3 |

(2) Defendant's Chart (adjusted)

| | TOTAL QSI'S | BLACK QSI'S | BLACK % QSI'S | BLACK % IN GS | P Value | Standard Deviations |
|------|-------------|-------------|---------------|---------------|---------|---------------------|
| 1976 | 114 | 9 | 7.9% | 13.4% | .0504 | −1.64 |
| 1977 | 90 | 6 | 6.7% | 14.0% | .0244 | −1.97 |
| 1978 | 148 | 18 | 12.3% | 14.8% | .2154 | − .79 |
| 1979 | 234 | 31 | 13.2% | 16.0% | .1468 | −1.05 |
| 1980 | 130 | 19 | 14.6% | 16.8% | .3022 | − .52 |
| 1981 | 123 | 20 | 16.3% | 18.3% | .3227 | − .46 |
| TOTAL | 839 | 103 | 12.3% | | | |

## APPENDIX 4

### TRAINING

(1) Plaintiff's Chart

1978

| Number of Training Courses | Black | | White | |
|----------------------------|-------|-------|-------|-------|
| | No. | % | No. | % |
| 0 | 730 | 92.2 | 2821 | 88.6 |
| 1 | 50 | 6.3 | 284 | 8.9 |
| 2 | 8 | 1.0 | 51 | 1.6 |
| 3 | 3 | 0.4 | 20 | 0.6 |
| 4 | 0 | 0.0 | 5 | 0.2 |
| 5 or more | 1 | 0.1 | 3 | 0.1 |
| Total | 792 | 100.0 | 3184 | 100.0 |

Standard deviation
−2.926

1979

| | | | | |
|---|---|---|---|---|
| 0 | 766 | 88.2 | 3023 | 82.8 |
| 1 | 67 | 7.7 | 420 | 11.5 |
| 2 | 19 | 2.2 | 131 | 3.6 |
| 3 | 10 | 1.2 | 35 | 1.0 |
| 4 | 2 | 0.2 | 16 | 0.4 |
| 5 or more | 5 | 0.6 | 24 | 0.7 |
| Total | 869 | 100.0 | 3649 | 100.0 |

Standard deviation
−3.760

1980

| Number of Training Courses | Black | | White | |
|----------------------------|-------|-------|-------|-------|
| | No. | % | No. | % |
| 0 | 825 | 86.7 | 2742 | 80.2 |
| 1 | 91 | 9.6 | 486 | 14.2 |
| 2 | 24 | 2.5 | 145 | 4.2 |
| 3 | 8 | 0.8 | 34 | 1.0 |
| 4 | 3 | 0.3 | 10 | 0.3 |
| 5 or more | 1 | 0.1 | 4 | 0.1 |
| Total | 952 | 100.0 | 3421 | 100.0 |

Standard deviation
−4.548

1981

| | | | | |
|---|---|---|---|---|
| 0 | 974 | 84.8 | 2884 | 76.9 |
| 1 | 98 | 8.5 | 558 | 14.9 |
| 2 | 43 | 3.7 | 178 | 4.7 |
| 3 | 19 | 1.7 | 63 | 1.7 |
| 4 | 6 | 0.5 | 39 | 1.0 |
| 5 or more | 9 | 0.8 | 31 | 0.8 |
| Total | 1149 | 100.0 | 3753 | 100.0 |

Standard deviation
−5.489

APPENDIX 4

(2) Defendant's Chart

TRAINING BY PAY PLAN -- TOTAL COURSES

| YEAR/PAY PLAN | TOTAL COURSES | TOTAL COURSES BLACKS | BLACK PERCENT TRAINING | BLACK PERCENT WORK FORCE | STANDARD DEVIATIONS |
|---|---|---|---|---|---|
| **1978** | | | | | |
| GS–1 to GS–4 | 105 | 31 | 29.5% | 23.1% | 1.65 |
| GS–5 and above | 385 | 38 | 9.9% | 9.1% | .63 |
| WG–1 to WG–9 | 10 | 2 | 20.0% | 51.8% | −1.72 |
| WG–10 and above | 53 | 2 | 3.8% | 12.9% | −1.95 |
| WL and WS | 15 | 4 | 26.7% | 23.3% | .65 |
| **1979** | | | | | |
| GS–1 to GS–4 | 250 | 63 | 25.2% | 24.7% | .27 |
| GS–5 and above | 842 | 85 | 10.1% | 10.1% | .07 |
| WG–1 to WG–9 | 40 | 14 | 35.0% | 52.7% | −2.09 |
| WG–10 and above | 104 | 13 | 12.5% | 15.1% | − .58 |
| WL and WS | 41 | 7 | 17.1% | 22.2% | − .58 |
| **1980** | | | | | |
| GS–1 to GS–4 | 215 | 54 | 25.1% | 26.4% | − .34 |
| GS–5 and above | 800 | 100 | 12.5% | 10.2% | 2.15 |
| WG–1 to WG–9 | 10 | 2 | 20.0% | 54.2% | −1.87 |
| WG–10 and above | 56 | 14 | 25.0% | 16.4% | 1.84 |
| WL and WS | 77 | 17 | 22.1% | 20.6% | .48 |
| **1981** | | | | | |
| GS–1 to GS–4 | 430 | 104 | 24.2% | 25.9% | .36 |
| GS–5 and above | 1151 | 183 | 15.9% | 12.8% | −3.08 |
| WG–1 to WG–9 | 44 | 10 | 22.7% | 53.6% | <−4 |
| WG–10 and above | 101 | 14 | 13.9% | 17.5% | − .82 |
| WL and WS | 69 | 17 | 24.6% | 20.3% | 1.05 |
| **1982** | | | | | |
| GS–1 to GS–4 | 83 | 25 | 30.1% | 29.0% | .36 |
| GS–5 and above | 89 | 11 | 12.4% | 13.2% | − .04 |
| WG–1 to WG–9 | 12 | 4 | 33.3% | 48.9% | − .79 |
| WG–10 and above | 35 | 10 | 28.6% | 18.3% | 1.73 |
| WL and WS | 5 | 0 | 00.0% | 20.6% | − .48 |