**Rachelle A. ROSENBERG, Plaintiff,**

v.

**UNIVERSITY OF CINCINNATI, et al., Defendants.**

**No. C–1–77–39.**

United States District Court, S.D. Ohio, W.D.

Sept. 29, 1986.

Charles G. Atkins, Cincinnati, Ohio, for plaintiff.

James A. Hunt, Paul A. Nemann, Cincinnati, Ohio, for defendants.

RICE, District Judge.

DECISION AND ENTRY SETTING LIMITED EVIDENTIARY HEARING ON DEFENDANTS' MOTION TO DECERTIFY CLASS (DOC. # 71); ENTRY ORDERING PLAINTIFF TO FILE LIST OF EVIDENCE TO BE INTRODUCED AT EVIDENTIARY HEARING WITHIN TWENTY DAYS OF RECEIPT OF THIS DECISION

This case is before the Court on Defendants' Motion to Decertify the Class (Doc. # 71), filed July, 1982. For the reasons set forth below, the Court finds that Defendants' motion cannot be overruled on the evidence in the record, and accordingly concludes that a "focused" evidentiary hearing must be conducted upon the merits of said motion.

(A) *Procedural Background*

This case originated with the filing of Plaintiff's Complaint on January 26, 1977. By an order of December 15, 1977 (Doc. # 23), Judge Timothy Hogan certified a class consisting of:

All women who have been employed in faculty positions at the University of Cincinnati at any time between July 15, 1974 and the present date who, it is claimed, have been discriminated against on the basis of sex by Defendants' claimed policies, practices and customs with respect to the terms of employment compensation or tenure.

The order further limited the class to claims based upon Title VII.

This case is presently before the Court on two motions: Defendants' Motion to Decertify the Class (Doc. # 71) and Plaintiff's Motion to Clarify Class Definition in Order to Determine the Temporal Scope of the Class (Doc. # 90). By a Decision and Entry on September 28, 1982 (Doc. # 74), this Court overruled Defendants' Motion to Decertify Class, but ordered Plaintiff to prepare and file affidavits setting forth her entitlement to class action relief under Rule 23(a). By an Entry on April 24, 1984 (Doc. # 103), the Court ordered oral argument on the Motion to Decertify the Class, and requested that the parties pay specific attention "to the question of exactly what is the pattern and practice alleged by the Plaintiff and, assuming same is identified, whether said pattern and practice is in fact University-wide." The Court indicated that based on oral argument, it would either overrule Defendants' Motion to Decertify the Class or order that a "focused" evidentiary hearing be conducted on the merits of said motion. The Court also indicated that it would defer ruling on Plaintiff's Motion to Clarify Class Definition until it had reached a decision on the decertification motion. The oral argument ordered by the Court was held May 10, 1984.

### (B) *Requirements for Class Certification—Rule 23(a)*

Before considering the affidavits filed by the parties for and against the decertification motion, the Court must set forth the legal framework for such review. In this case, this dispute over decertification centers around the meaning of the requirements for class certification set forth in Fed.R.Civ.P. 23(a). Rule 23(a) provides:

Prerequisites to a class action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

In the context of Title VII actions, the Supreme Court has repeatedly insisted that the requirements of commonality and typicality be carefully enforced. As the Court stated in *East Texas Motor Freight v. Rodriguez*, 431 U.S. 395, 405–06, 97 S.Ct. 1891, 1897–98, 52 L.Ed.2d 453 (1977):

[S]uits alleging racial or ethnic discrimination are often by their very nature class suits, involving class-wide wrongs. Common questions of law or fact are typically present. But careful attention to the requirements of Fed. Rule Civ. Proc. 23 remain nonetheless indispensable. The mere fact that a complaint alleges racial or ethnic discrimination does not in itself insure that the party who has brought the lawsuit will be an adequate representative of those who may have been the real victims of that discrimination.

In *General Telephone Company fo the Southwest v. Falcon*, 457 U.S. 147, 157, 102 S.Ct. 2364, 2370, 72 L.Ed.2d 740 (1982), the Supreme Court elaborated on the need for careful attention to the requirements of Rule 23(a):

We cannot disagree with the proposition underlying the across-the-board rule—that racial discrimination is by definition class discrimination. But the allegation that such discrimination has occurred neither determines whether a class action may be maintained in accordance with Rule 23 nor defines the class that may be certified. Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of class claims.

*See also Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 877–78, 104 S.Ct. 2794, 2800–01, 81 L.Ed.2d 718 (1984) ("*Falcon* thus holds that the existence of an individual claim does not necessarily warrant the conclusion that the individual plaintiff may successfully maintain a class action. It is equally clear that a class plaintiff's attempt to prove the existence of a company-wide policy, or even a consistent practice within a given department, may fail even though discrimination against one or two individuals has been proved."). Trial courts therefore must be diligent in applying the requirements of Rule 23(a):

> [T]he error inherent in the across-the-board rule is the failure to evaluate carefully the legitimacy of the named plaintiff's plea that he is a proper class representative under Rule 23(a).... Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.

*Falcon,* 457 U.S. at 160, 102 S.Ct. at 2372. As a practical matter, it must be noted that the requirements of commonality and typicality tend to merge in the context of Title VII class actions. *See id.* at 157 n. 13, 102 S.Ct. at 2370 n. 13.

A number of lower courts have elaborated upon this commonality/typicality requirement. For example, in *Patterson v. General Motors Corp.,* 631 F.2d 476, 481 (7th Cir.1980), the Court held:

> A certifiable class claim must arise out of the same legal or remedial theory ..., and grievances of other employees similar to those asserted by plaintiff would not meet that requirement. The issue of whether a particular job assignment or promotional denial was discriminatory would depend on any number of factors peculiar to the individuals competing for the vacancy, including relative seniority, qualifications, availability of work and desire to perform the job. Each disciplinary action would present a different set of facts for each employee. "In other words, the plaintiff's claims do not relate to *general policies and practices* which are allegedly discriminatory, but rather to *individualized claims of discrimination* which could not possibly present common questions of law or fact sufficient to justify class action treatment." *Patterson v. General Motors,* No. 73 C 1751 (N.D.Ill. Sept. 26, 1974) at 7.

*See also Taylor v. Safeway Stores, Inc.,* 524 F.2d 263, 270 (10th Cir.1975); *Harris v. Marsh,* 100 F.R.D. 315, 324 (E.D.N.C.1983) ("Typicality requires that 'the claims or defenses of the class "resemble" or "exhibit the essential characteristics of" the class representatives.' ... [A] plaintiff must also show that the impact of those [broad discriminatory] policies on him is not wholly abherent or dissimilar from the impact on other class members." (citations omitted)). However, courts have noted that: "[t]ypicality does not require that the claim or defenses of the class representative be identical or perfectly co-extensive with the claims or defenses of its members; *substantial similarity* is satisfactory." *Irvine v. American National Bank and Trust Company of Chicago,* 108 F.R.D. 12, 13 (N.D.Ill.1985) (emphasis added) (quoting *Allen v. Isaac,* 99 F.R.D. 45, 54 (N.D.Ill. 1983)).

The commonality/typicality determination becomes particularly difficult in the context of a common system of employment containing autonomous decision making units. For example, in *Sperling v. Donovan,* 104 F.R.D. 4, 5 (D.D.C.1984), white employees of the Office of the Assistant Secretary of Administration and Management ("OASAM") at the Department of Labor sought class certification in an employment discrimination suit. The court refused to certify the class stating:

> In the case at bar, plaintiffs simply assert an identity of interest and injury between themselves and all whites is OASAM's seventy-one job categories. They have not shown how their claims would be typical of the claims of such a diverse group of employees. Only race

unifies that group. More is required to justify certification as a class. The mere allegation of across the board discrimination is not sufficient.

*Id.* at 6. Thus, where employment decisions are subject to nearly complete local or departmental autonomy, the commonality/typicality requirement will not have been met. *See Stastny v. Southern Bell Telephone and Telegraph Company,* 628 F.2d 267 (4th Cir.1980). However, as the Supreme Court has recently pointed out, where the employment decision originates jointly from the local or departmental unit and the common employer, the commonality/typicality requirement will have been met. *See Bazemore v. Friday,* —— U.S. ——, 106 S.Ct. 3000, 3011–12 & n. 17, 92 L.Ed.2d 315 (1986).

■ In considering whether class action is appropriate in employment discrimination actions against colleges and universities, courts have noted that these institutions often employ "a decentralized method of decision-making involving peer group evaluation in autonomous departments." *Michigan State University Faculty Association v. Michigan State University,* 93 F.R.D. 54, 60 (W.D.Mich.1981). Even those cases which have allowed class certification in such suits have required that "the claims of the plaintiffs of the putative class be grounded in the same legal theory and arise from the same practices." *Penk v. State Board of Higher Education,* 93 F.R.D. 45, 50 (D.Ore.1981); *see also Zahorik v. Cornell University,* 34 F.E.P. Cases (BNA) 153 (N.D.N.Y.1982). The crucial distinction in university discrimination cases is between those universities which have a centralized decision making process in which individual factors may be considered, *see Penk,* 93 F.R.D. at 50; *Zahorik,* 34 F.E.P. Cases (BNA) at 156–57, and those universities with a decentralized decision making process which may be reviewed by some higher authority, *see Michigan State University Faculty Association,* 93 F.R.D. at 60; *Lucky v. Board of Regents,* 34 F.E.P. Cases (BNA) 986, 989–91 (S.D.Fla.1981); *Townsel v. University of Alabama,* 80 F.R.D. 741 (N.D.Ala.1978);

*O'Connell v. Teachers College,* 63 F.R.D. 638 (S.D.N.Y.1974). In other words, the question is whether the decision making processes within the university permit a common pattern or practice of discrimination to occur therein.

■ In determining whether a university's structure is sufficiently centralized so as to allow a common pattern or practice of discrimination to occur, both anecdotal and statistical evidence are relevant. *See, e.g., Carpenter v. Steven F. Austin State University,* 706 F.2d 608, 617 (5th Cir.1983). At the certification stage, the purpose of statistical evidence is limited:

> The role of statistical evidence at the certification stage is not, as at trial, to support an inference of racial discrimination; at this point, the court must accept plaintiff's allegations of discrimination as true.... A convincing statistical showing *can,* however, when combined with significant anecdotal evidence, demonstrate that the claims of the named plaintiffs are typical of those of the putative class members, and that, therefore, the class is so numerous that joinder of all the members would be impracticable.

*Harris v. Marsh,* 100 F.R.D. at 324 (emphasis in original). However, in order to be relevant, statistics must "offer the relevant comparisons of similarly situated female and male employees...." *Sheehan v. Purolator, Inc.,* 103 F.R.D. 641, 649 (E.D.N.Y. 1984).

In sum, Plaintiff, in order to avoid the Court's sustaining of this Motion to Decertify the Class, must come forward with anecdotal and statistical evidence showing that the University of Cincinnati's employment decision-making processes were sufficiently centralized so that a common pattern or practice of discrimination makes Plaintiff's claims typical of all class members.

### (C) *Evidence on the Record*

In this case, both Plaintiff and Defendants have put into the record documentary evidence in support of their respective

claims. While the party seeking class certification, or in this case to preserve class certification, has the burden of showing that the requirements of Rule 23(a) have been met, *see, e.g., Berggren v. Sunbeam Corp.*, 108 F.R.D. 410, 411 (N.D.Ill.1985), in evaluating the record in this case, the Court believes it is appropriate to review first the materials that the Defendant has introduced to show a decentralized decision-making process at the University of Cincinnati.

In support of their argument for decertification, Defendants have submitted the affidavits of Thomas Wagner and of Maryse Eymonerie. The affidavit of Thomas Wagner (Doc. # 99), Vice Provost at the University of Cincinnati, outlines the organization of the University. This affidavit, in sum, supports his contention that "the Board [of Trustees] delegates authority to departments for academic and personnel policy matters. Departments develop their own administrative structures and govern its procedures through bylaws, define their program or mission as a unit, establish standards and criteria by which the performance of faculty members would be judged, and determine procedures for decision-making regarding initial appointment, reappointment, promotion, tenure and salary." Employment Practices, Decision-Making, University of Cincinnati (attached to Doc. # 99) at 2. The affidavit goes on to describe in detail various examples of how decision-making on personnel issues is decentralized and departmental at the University of Cincinnati.

The affidavit of Maryse Eymonerie (Doc. # 94) contains a detailed "step-wise progression" analysis of sex based employment discrimination at the University of Cincinnati. This analysis concludes that sex is not a significant factor in the differences in salary among University of Cincinnati faculty members, either on a University-wide basis or within specific schools. The affidavit also attempts to rebut the criticisms made of it by Plaintiff's expert, Richard Goldstein.

Plaintiff has placed into the record the affidavits of Rachelle A. Rosenberg, Edna Rawlings, Dee Graham, Patricia O'Neal, Michelle Fleming and Richard Goldstein.

Rachelle Rosenberg's affidavit (Doc. # 77) essentially alleges that she was discriminated against in being hired into a non-tenure tract position, in being paid less than male colleagues with comparable academic degrees, rank, years of service, experience, qualifications, skill and responsibility, in not being given the same opportunity or consideration for promotion for tenure as male colleagues, and in being assigned a work load inconsistent with her rank and pay within the University.

The affidavit of Edna Rawlings indicates that she, while in a joint position in the Department of Psychology and the Counseling Center of the University, was discriminated against by being hired at a salary which did not reflect her prior experience and rank, in being asked not to apply for tenure in 1978–79 because another woman and several males were applying in that year, and because in 1982, the University granted her only half the salary increase recommended by the Salary Review Committee. Dr. Rawlings also indicates that in her capacity as a member of Committee W of the American Association of University Professors, she has found a number of similar discriminatory practices existing throughout the University.

The affidavit of Dee Graham (Doc. # 85) indicates that she was discriminated against by not being recommended for tenure by the Department of Psychology, and that it was only upon the Dean of the College of Arts and Science's reconsideration of his earlier decision that she was granted tenure. Dr. Graham also indicates that as a member of Committee W, she has observed a broad number of discriminatory actions against women throughout the University.

The affidavit of Patricia O'Reilly (Doc. # 86) indicates that she was discriminated against in that she was recommended to a post as Head of the Department of Learning, Development and Social Foundations

by the faculty members in that department, but that the recommendation was rejected by the Dean, who instead appointed a white male candidate. Dr. O'Reilly also attaches to her affidavit a report of discrimination from Committee W, which she has chaired since 1980.

The affidavit of Michelle Fleming has attached to it a number of materials received during discovery by the Plaintiff, including regulations of the Board of Trustees, the University's collective bargaining agreement with faculty members, University policy statements regarding affirmative action, affirmative action reports and various letters and memos relevant to Rachelle A. Rosenberg's claim.

The affidavit of Richard Goldstein (Doc. # 83), one of Plaintiff's statistical experts, has attached to it a "Preliminary Analysis of University of Cincinnati Concerning Male and Female Faculty." This report contains analysis of whether the mean salaries of men and women faculty members at the University are equal, and a multiple regression analysis, which Dr. Goldstein says shows that even after controlling for other variables, the difference between men and women faculty members' salaries is statistically significant for the years 1972 and 1976.

### (D) Conclusions

■ After reviewing the anecdotal and statistical evidence contained in the affidavits submitted by Plaintiff together with and in light of the Defendants' affidavits, the Court must conclude that Plaintiff has failed to show a decision-making structure at the University of Cincinnati which is sufficiently centralized for a common pattern or practice of discrimination to have occurred. In reaching this conclusion, the Court is cognizant of the fact that it is not to review the merits of Plaintiff's case in the context of this Motion for Class Decertification, but rather merely to determine whether sufficient commonality/typicality exists so as to allow class certification under Rule 23(a). Indeed, the Court accepts all of Plaintiff's anecdotal accounts of employment discrimination as true, for purposes of consideration of the motion under discussion, and is even willing to assume, arguendo, that a multiple regression analysis would show on a University-wide basis some statistically significant difference due to sex. However, even assuming these allegations to be true, nothing in Plaintiff's evidence on the record points to a pattern or practice of employment discrimination common to the entire University.

While Plaintiff's anecdotal evidence presents numerous accounts of serious acts of sex discrimination in personnel practices, nothing in that evidence tends to show that those violations arise out of a common pattern or practice based upon centralized decision-making in the University. Rather, some of the alleged acts arise out of individual department's particular personnel policies while other incidents indicate discrimination only at the Dean's level or higher. In some cases, the department allegedly discriminated and the Dean reversed the discriminatory decision; in other cases, the departments were non-discriminatory but the Dean refused to follow departmental recommendations and thus discriminated. Compare affidavit of Dee Graham (Doc. # 85 at ¶ 2) with affidavit of Patricia O'Reilly (Doc. # 86 at ¶ 2). Nothing in this anecdotal evidence indicates in any way that the representation of a decentralized decision making process at the University made by Thomas Wagner (see Doc. # 99) is untrue.

Plaintiff's statistical evidence suffers from a similar deficiency. Even ignoring Defendants' argument that this evidence fails to show a statistically significant difference between the salaries of men and women faculty members, it is clear that this evidence fails to show that a pattern of discrimination is common in the salary decision-making function of the various departments within the University. In this Court's view, such a showing might be made by a statistical comparison of male-female salary differentials in various departments which indicated that the differential was statistically close throughout.

Here, however, Plaintiff has apparently thrown the whole faculty into one barrel and concluded that within that whole, a statistically significant salary differential exists. Such a procedure can be misleading. For example, ninety percent of this difference might be caused by the practices of the School of Medicine (or any other division within the University), while other departments might have near parity. Therefore, the Court must conclude that Plaintiff's statistical evidence fails to show a relevant common pattern and practice of discriminatory treatment in the University.

The Court must, therefore, conclude that the documentary evidence placed into the record by Plaintiff fails to show a common pattern and practice of employment discrimination among the various schools and departments at the University. In other words, Plaintiff has failed to show that her claims are substantially similar to those of other female faculty members at the University. Accordingly, the Court, based upon the documentary evidence before it, cannot overrule Defendants' Motion to Decertify the Class.

### (E) *Further Proceedings*

As noted above, this Court has previously indicated that were it to be unable to overrule Defendants' Motion to Decertify Class based on the documentary evidence submitted to it, it would hold a "focused" hearing on the decertification issue. As should be clear from the discussion in this Decision, such a hearing would be limited to the issue of whether personnel decision-making at the University of Cincinnati is sufficiently centralized so that a common pattern or practice of employment discrimination based on sex could have occurred.

However, in order to insure that this evidentiary hearing is not a mere rehashing of the evidence already before the Court, Plaintiff is ordered within twenty days of receipt of this Decision to file with the Court a list of the evidence it intends to present at this hearing. The Court will review this list in light of the evidence already considered in order to determine whether an evidentiary hearing is in fact necessary in this case. A telephone conference will then be had in order either to inform the parties that no evidentiary hearing need be held in this matter or to set a date for such a hearing.

 In sum, the Court concludes, based on the record before it, that Defendants' Motion to Decertify the Class (Doc. #71) cannot be overruled at this time. Plaintiff will submit to the Court a list of the evidence it would present at an evidentiary hearing on the decertification issue. Based on this list, the Court will determine whether a "focused" evidentiary hearing is necessary or whether Defendants' motion can be granted based upon the facts now in the record.